UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL E. WYNN,

        Petitioner,

v.                                      CASE NO. 2:10-cv-12713
                                        HONORABLE MARIANNE O. BATTANI
MARY BERGHUIS,

        Respondent.

_____/

**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Petitioner Michael E. Wynn has filed a pro se habeas corpus petition pursuant to 28 U.S.C. § 2254.  The habeas petition challenges Petitioner's state convictions for second-degree murder, MICH. COMP. LAWS § 750.317, and possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b. Respondent Mary Berghuis urges the Court to deny the petition on grounds that Petitioner's claims are procedurally defaulted or meritless.  Having reviewed the pleadings and record, the Court agrees with Respondent that Petitioner is not entitled to habeas corpus relief.  Consequently, the habeas petition will be denied.

## I. BACKGROUND

### A. The Trial Testimony

The charges against Petitioner arose from the fatal shooting of Renita Thomas in Detroit, Michigan on February 27, 2004.  Petitioner was tried before a jury in Wayne

County Circuit Court.

### 1. Prosecution Witnesses

Ms. Thomas's fifteen-year-old daughter, Carlotta Thomas, testified that, on February 27, 2004, she was living with her mother on Novara Street in Detroit. Petitioner was her mother's friend, and "Vernor" was her aunt's boyfriend. On the day in question, a neighbor had been threatening them. As a result of the threats, Petitioner and Vernor brought some guns to their house. Later that afternoon, Carlotta heard her mother and Petitioner talking in the kitchen. She heard her mother say something like, "Stop messing or playing with the gun, leave it alone, put it down." Then she heard a gunshot. She walked into the kitchen and saw her mother lying against the stove. She was bleeding from her head. Petitioner came out of the kitchen as Carlotta entered the kitchen. He said, "Sorry, God, sorry, God," and instructed her to call the police.

Carlotta's sister, fourteen-year-old Ashley Thomas, corroborated Carlotta's testimony. Police Officer Darren Stallworth testified that he was the first officer to respond to the scene. He saw Petitioner running around outside the house. He was shouting, "I shot her, I shot her. I didn't know the gun was loaded. I shot her." The victim was inside the house, slumped against the oven in the kitchen. A shotgun was lying on the floor approximately three feet from the victim, and it looked like half of her face had been blown off. There was blood on the floor, on the ceiling, and on the walls.

Officer Terrica Channells also responded to the crime scene. She saw Petitioner exit the side door of the house. He was in a confused state of mind and said, "I just shot her, I just shot my girlfriend." Officer Channells detained Petitioner in the scout car, where he said, "I just sat it on the counter and it went off." He also said that he did not

2

know the gun was loaded.

Sergeant William Anderson noticed a pump action shotgun on the kitchen floor of the house and a rifle on top of the microwave oven.  He subsequently interviewed Petitioner at the police precinct.  In his statement to Sergeant Anderson, Petitioner explained that he took a shotgun to Ms. Thomas's house after Ms. Thomas called him and suggested that he bring some "protection" due to an argument that she had with another family.  The shotgun was in two pieces, but Ms. Thomas's brother-in-law, Vern, put the shotgun together at the Thomas residence.  He (Petitioner) did not put any shells in the gun, and he did not know how it got loaded.  There were shells on top of the microwave oven, and Vern's rifle was on the kitchen table.  After Vern and his girlfriend  went to McDonald's, Ms. Thomas told him to "get that shit off the kitchen table."  He picked up the gun and moved across the room.  The gun accidentally fired when he bumped into a cabinet next to the stove.  He then told Carlotta to call 911 and waited for the police to arrive.

Evidence technician Frank Horan processed the crime scene.  He collected two firearms in the kitchen:  a loaded twelve-gauge Mossberg shotgun on the kitchen floor near the victim and a 3030 carbine with a bag containing a loaded clip for the carbine on top of the microwave oven.

Lloyd Allen testified as an expert witness on firearms.  He explained to the jury that he tested the shotgun in evidence before trial and determined that it functioned properly.  The shotgun did not fire when he dropped it from a height of about three feet, and, in his opinion, the gun would not discharge accidentally if it were bumped against a hard object.  The only time the gun fired during testing was when the trigger was pulled.

3

Dr. Carl Schmidt testified that the victim died from a contact gunshot wound to the head.  This meant that the muzzle of the gun was touching the victim's head when it was fired.

### 2. Defense Witnesses

Detective Dale Collins testified for the defense.  He explained that his role at the crime scene was to determine what happened.  To that end, he took statements from the victim's daughters and Petitioner.  His synopsis of the investigation that night was read to the jury.  Among other things, the synopsis indicated that Vernor Norwood loaded the shotgun before leaving Ms. Thomas's house to go to McDonald's.  The synopsis also indicated that Petitioner had said the gun discharged when he picked it up to move it and it hit the counter.  Detective Collins thought that the shooting appeared to be accidental.  He released Petitioner from custody after Petitioner gave his statement.

Petitioner testified that Ms. Thomas was his girlfriend.  He explained that, on the day of the shooting, Ms. Thomas called and asked him to come to her house because someone had threatened her with a baseball bat.  He brought the shotgun and a box of ammunition to the house, but the gun was in two pieces and he had never shot it.  Nor did he routinely use firearms.  Vernor put the shotgun together at Ms. Thomas's house. Both the shotgun and Vernor's gun were in the kitchen.  Ms. Thomas later said to him, "Get that shit off the table before somebody gets hurt."  He picked up the gun from the table and turned around.  The gun hit the counter and fired.  He blacked out for a minute and then, after instructing Carlotta to call the police, he went outside and explained what happened to a man across the street.

Petitioner claimed that he did not know the shotgun was loaded and that he did

4

not intend to shoot Ms. Thomas.  He also claimed that he loved Ms. Thomas, but he admitted that he did not go back inside the house to check on her after the shooting. The reasons he gave for not checking on Ms. Thomas were that he was scared he had done something wrong and may have committed a crime and he did not want Ms. Thomas to die.

On cross-examination by the prosecutor, Petitioner denied pointing a gun at Ms. Thomas or placing the gun against her head.  He admitted, however, that his hand had been on the trigger.  He also assumed, without checking, that the gun was unloaded. Although he watched Vernor put shells in the shotgun, he claimed that Vernor subsequently removed the shells and that he took the shells from Vernor and put them on the microwave oven.  On redirect examination, Petitioner stated that the gun was meant to be a bluff and that he had planned to leave it at the house for Ms. Thomas to use.  He also stated that when the gun hit the counter, it caused his finger to pull the trigger.

## B.  The Verdict and Sentence

The defense theory was that the shooting was an accident.  The trial court instructed the jury on the charged offense of second-degree murder and on the lesser offenses of involuntary manslaughter and careless, reckless or negligent use of a firearm with injury or death resulting.  On January 14, 2005, the jury found Petitioner guilty, as charged, of second-degree murder, Mich. Comp. Laws § 750.317, and felony firearm, Mich. Comp. Laws § 750.227b.  On January 28, 2005, the trial court sentenced Petitioner to two years in prison for the felony firearm conviction and to a consecutive term of 270 to 400 months (twenty-two and a half to thirty-three and a third years) in

5

prison for the murder conviction.[1]

## C.  The Appeals

In an appeal of right, Petitioner raised three sentencing issues.  He also argued that the evidence was insufficient to convict him of second-degree murder, that the trial court erred in failing to instruct the jury on his defense, and that trial counsel was ineffective for failing to request an instruction on his defense.  The Michigan Court of Appeals rejected these claims and affirmed Petitioner's conviction in a per curiam opinion.  See People v. Wynn,  No. 261039 (Mich. Ct. App. June 27, 2006) (unpublished).  On November 29, 2006, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  See People v. Wynn, 723 N.W.2d 816 (Mich. 2006) (table).

Petitioner subsequently filed a motion for relief from judgment.  The trial court denied his motion on the basis that Petitioner had failed to demonstrate "good cause" for failing to raise his claims on appeal and "actual prejudice" from the alleged irregularities.  Petitioner appealed the Court's decision, raising the claims contained in his habeas petition.  The Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  See People v. Wynn, No. 288046 (Mich. Ct. App. Mar. 27, 2009) (unpublished).  On October 26, 2009, the Michigan Supreme Court denied leave to appeal for the same reason.  See People v. Wynn, 773 N.W.2d 677 (Mich. 2009) (table).

## D.  The Habeas Petition and Responsive Pleading

---

[1]  The judgment of sentence states that the sentence for the murder conviction is twenty-two and a third to thirty-three and a half years.

Petitioner filed his habeas corpus petition in this Court on July 9, 2010. He claims that: (1) the trial court abused its discretion by denying his motion for relief from judgment; (2) the trial court abused its discretion by accepting the parties' stipulation regarding an unavailable prosecution witness and by allowing the witness's out-of-court statement to be entered into the record; (3) the prosecutor deprived him of due process by deeming the disputed prosecution witness unavailable; and (4) his trial and appellate attorneys were ineffective.

Respondent argues in her answer to the habeas petition that the first habeas claim is not a stand-alone claim and that Petitioner is not entitled to habeas relief on the basis of his fourth claim. Respondent asserts that the second and third habeas claims are procedurally defaulted because Petitioner raised those claims for the first time on state collateral review rather than on direct appeal.

Procedural default is not a jurisdictional matter, Trest v. Cain, 522 U.S. 87, 89 (1997), and the Court finds it more efficient to address the merits of Petitioner's claims than to analyze whether the claims are procedurally defaulted. Consequently, the alleged procedural defaults are excused. The Court will proceed to address the substantive merits of Petitioner's claims, using the following standard of review.

## II. STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims

7

on the merits

      (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S. Ct. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

### III.  DISCUSSION

## A.  The Trial Court's Denial of Petitioner's Post-Conviction Motion

Petitioner alleges that the trial court abused its discretion and deprived him of due process of law by denying his motion for relief from judgment. Specifically,

8

Petitioner claims that the trial court erred by finding that he failed to demonstrate "good cause" for not raising his claims on direct appeal and "actual prejudice" from the alleged irregularities.  Petitioner contends that the trial court should have considered his allegation that appellate counsel was "cause" for his failure to raise his claims on direct appeal.

Petitioner disagrees with the trial court's interpretation of Michigan Court Rule 6.508(3), which prohibits state courts from granting relief from a judgment of conviction if the defendant "alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence . . . ."  An exception exists if the defendant demonstrates "good cause for [the] failure to raise such grounds on appeal" and "actual prejudice from the alleged irregularities that support the claim for relief."  Id.

Petitioner's claim lacks merit because "relief may not be granted to a habeas petitioner for alleged deficiencies in a state's post-conviction procedures . . . ."  Roe v. Baker, 316 F.3d 557, 571 (6th Cir. 2002) (citing Kirby v. Dutton, 794 F.2d 245, 247 (6th Cir.1986)).  Even if Petitioner could demonstrate that the trial court deprived him of a full and fair hearing on his post-conviction motion, an error in the state court's interpretation of Rule 6.508(D)(3) would be an error state law, which is not a cognizable claim on habeas corpus review.  Simpson v. Jones, 238 F.3d 399, 406-07 (6th Cir. 2000) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), and Smith v. Phillips, 455 U.S. 209, 221 (1982)).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  McGuire, 502 U.S. at 68 (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975) ( per

9

curiam)).  Petitioner therefore has no right to habeas relief on the basis of his first claim.

## B.  The Admission of an Witness's Out-of-Court Statement

Petitioner's remaining claims pertain to Vernor Norwood's statement to a defense investigator.  Petitioner alleges that the prosecutor deprived him of due process by deeming Mr. Norwood unavailable and that defense counsel was ineffective for stipulating that Norwood was unavailable.  Additionally, Petitioner asserts that the trial court abused its discretion by accepting the parties' stipulation that Mr. Norwood was unavailable and by allowing Mr. Norwood's out-of-court statement to be read to the jury. Petitioner contends that the admission of Norwood's out-of-court statement in evidence at trial violated his constitutional right to confront the witnesses against him. Lastly, Petitioner alleges that appellate counsel was ineffective on direct appeal for not raising the issue of trial counsel's ineffectiveness.

### 1.  Clearly Established Federal Law

Petitioner alleges violations of his constitutional rights to due process of law and to confront the witnesses against him.  The Due Process Clause of the Fourteenth Amendment to the United States Constitution "imposes minimum standards of fairness on the States, and requires state criminal trials to provide defendants with protections 'implicit in the concept of ordered liberty.'"  Danforth v. Minnesota, 552 U.S. 264, 269-70 (2008) (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)).

The Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal prosecution "the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.  "The Amendment contemplates that a witness who makes

10

testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." Giles v. California, 554 U.S. 353, 358 (2008) (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)). "Testimonial" evidence includes, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68.

### 2. The Factual Background

The prosecution endorsed Vernor Norwood as a witness, but Norwood was also a potential defense witness. Before any testimony was taken at Petitioner's trial, defense counsel explained to the trial court that Norwood was refusing to testify. Defense counsel noted that Norwood had a prior felony conviction and that Norwood was afraid of getting in trouble on the basis of testimony that he had possessed a firearm. Defense counsel requested a warrant for Norwood's arrest, but he was also willing to stipulate to the contents of Norwood's statement to the defense investigator. (Trial Tr. vol. II, 7-8, 11-15, Jan. 12, 2005.)

Later in the trial, the trial court informed the jurors that, pursuant to the parties' stipulation, Vernor Norwood's statement would be read to them in lieu of his live testimony. (Id. at 200-01.) Defense counsel then read Norwood's statement to the defense investigator regarding the fatal shooting of Ms. Thomas on February 27, 2004.

In his statement to the defense investigator, Mr. Norwood said that he knew both Petitioner and Ms. Thomas and that he had been dating Ms. Thomas's sister, Nicole Smith. On the day of the shooting, Ms. Smith called and asked him to come to Ms.

11

Thomas's home because Ms. Thomas was being threatened by a woman and three "guys."  Norwood acquired his 3030 carbine and went to Ms. Thomas's home.  He placed the carbine on the microwave oven.  Petitioner arrived at Ms. Thomas's house approximately fifteen to twenty minutes later with a clear plastic bag containing a Mossberg 500 shotgun, which was broken down.  Norwood put the shotgun together and loaded it.  He then placed the shotgun on the kitchen table and went outside with Ms. Smith, Petitioner, and Ms. Thomas.  He subsequently left the house and went to McDonald's with Ms. Smith and their son.  Within a short period of time, they were informed that Ms. Thomas had been shot.  They returned to Ms. Thomas's home.  The police were at the house, and Petitioner was seated in a patrol car.  (Id. at 202-03.)

When the investigator asked Norwood whether Petitioner had been aware that Norwood loaded the shotgun, Norwood answered, "No, he wasn't.  Michael was outside at the time."  And when the investigator asked whether Norwood had told Petitioner before leaving for McDonald's that the shotgun was loaded, Norwood responded, "No, I didn't."  Norwood also said that he was not aware of any disagreements or arguments between Petitioner and Ms. Thomas and that, to his knowledge, Petitioner and Ms. Thomas were getting along fine.  He added that Petitioner and Ms. Thomas did a lot of things for each other.  (Id. at 203-04.)

### 3.  Analysis

It is clear from the record that Vernor Norwood was not an available witness.  His refusal to testify at Petitioner's trial on the basis that he might subject himself to criminal liability for being a felon in possession of a firearm made him unavailable.  See United States v. Johnson, 581 F.3d 320, 327 (6th Cir. 2009) (finding the likelihood that a co-

2:10-cv-12713-MOB-CEB   Doc # 12   Filed 01/10/13   Pg 13 of 16   Pg ID 800

defendant would invoke the Fifth Amendment if called to testify rendered him unavailable as a witness); United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir. 1986) (concluding that a co-defendant's refusal to testify made him unavailable). Consequently, the prosecutor did not deprive Petitioner of due process by deeming Norwood unavailable.

For the same reason, and because the parties stipulated to the admission of Norwood's out-of-court statement, the trial court did not violate Petitioner's right to due process by accepting the parties' stipulation that Norwood was unavailable and that his out-of-court statement could be read into the record.  See, e.g., United States v. Mejia-Alarcon, 995 F.2d 982, 991 (10th Cir. 1993) (holding that the defendant's right to due process was not violated by the trial court's acceptance of a stipulation regarding one or more elements of the government's case, even though the court did not ascertain whether the defendant understood and voluntarily entered the stipulation, where the defendant was present in court and represented by counsel at the time of the stipulation).

The Court need not determine whether Mr. Norwood's statement to a defense investigator was "testimonial" under Crawford, because, even if it were testimonial, defense counsel stipulated to admitting the statement.  A party may not complain of Confrontation Clause errors that he himself invited.  United States v. Cromer, 389 F.3d 662, 678 n. 11 (6th Cir. 2004) (quoting Harvis v. Roadway Express, Inc., 923 F.2d 59, 60 (6th Cir.1991)).

Norwood's statement, moreover, was not offered against Petitioner.  It was beneficial to Petitioner's case because it indicated that Petitioner had a good

relationship with Ms. Thomas and was unaware that the shotgun used in the shooting was loaded.  This evidence supported Petitioner's defense that the shooting was accidental.  The Confrontation Clause has no application to out-of-court statements that are offered by, not against, the accused.  <u>United States v. Miller</u>, 319 F. App'x 351, 356 (6th Cir. 2009) (citing <u>Cromer</u>, 389 F.3d at 671).

Petitioner concedes that Norwood's statement was favorable to him.  He contends, however, that if Norwood had testified, the jury would have been able to assess his demeanor and would have accorded his comments greater credibility.  Whether the jury would have given more weight to Norwood's live testimony than to his statement to the investigator is speculative.  It appears more likely that, if Norwood had been brought to court, he would have refused to testify and would have invoked his Fifth Amendment right not to incriminate himself.  In conclusion, because Norwood's statement to the investigator was favorable to Petitioner and not offered against him, Petitioner's rights under the Confrontation Clause were not violated.

### 4. Trial and Appellate Counsel

Petitioner's ineffective-assistance-of-counsel claims fare no better.  To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  The "deficient performance" prong requires showing that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id</u>. at 687.  To demonstrate that counsel's performance prejudiced the defense, a petitioner must show "a reasonable probability that, but for counsel's

14

unprofessional errors, the result of the proceeding would have been different." Id. at 694.  "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 131 S. Ct. at 788 (internal and end citations omitted).

Defense counsel was not ineffective for stipulating to the reading of Norwood's statement because Norwood personally informed defense counsel that he did not intend to testify at Petitioner's trial.  By stipulating to the admission of Norwood's statement, defense counsel ensured that the jury would hear evidence favorable to Petitioner.

Appellate counsel likewise was not ineffective.  Because "trial counsel performed adequately, [the Court's] inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001).

## IV.  CONCLUSION

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to clearly established federal law, unreasonable applications of federal law, or unreasonable determinations of the facts.  Accordingly, the petition for a writ of habeas corpus [Doc. #1] is **DENIED**.

## V.  DENIAL OF A CERTIFICATE OF APPEALABILITY; LEAVE TO APPEAL IN FORMA PAUPERIS

The Court declines to issue a certificate of appealability because Petitioner's claims are not adequate to deserve encouragement to proceed further, and reasonable jurists would not find the Court's assessment of Petitioner's constitutional claims debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).  Nevertheless, if

Petitioner appeals this Court's decision, he may proceed in forma pauperis on appeal

because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).




                                        s/Marianne O. Battani
                                        MARIANNE O. BATTANI
                                        UNITED STATES DISTRICT JUDGE
Dated: January 10,2013

                          CERTIFICATE OF SERVICE

        I hereby certify that on the above date a copy of this Opinion and Order was
served upon the Petitioner via ordinary U.S. Mail and Counsel for the Respondent via
the Court's ECF Filing System.

                                        s/Bernadette M. Thebolt
                                        Case Manager

16